[No. 44799-8-I. Division One. February 20, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. RAY J. BRADLEY, *Appellant.*

*A. Mark Vanderveen*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Catherine M. McDowall, Deputy*, for respondent.

WEBSTER, J. — Three undercover police officers saw Ray Bradley running from an area where they had heard gunshots. Upon approach, they observed him lean into a car and then walk away. After they detained him with handcuffs and frisked him, he told them that he ran because someone had shot at him but that he was about to walk back to get his jacket. Meanwhile, another police officer radioed a witness description of the suspect that matched Bradley. And, one of the officers found gun shell casings near the area where they first spotted Bradley running. The officers searched the car for a gun and eventually found it. Bradley moved to suppress the gun, alleging an illegal search of his car. The trial court found that it was a valid protective search. Bradley appeals, arguing that the trial court erred because there was no danger to officer safety at the time of the search. We agree that there was no danger to officer safety but affirm because the police had probable cause to arrest Bradley at the time of the search.

## FACTS

At about 11:30 p.m. on November 1, 1998, Seattle Police Officers Scott Leist, Ron Giroux and David Larrabee heard six gunshots fired in rapid succession coming from one or two blocks north of their location near Pike Street. Based on their training and experience, the officers determined that all six shots were fired from a single medium-range caliber firearm. After hearing the shots, the officers jumped into their unmarked police car and drove north. They saw a black male wearing a brownish shirt and dark pants running towards them. They lost sight of the man for a few seconds when he turned into a parking lot.

When the officers turned their vehicle into the parking lot, they saw the same man standing at a blue, older model

Cadillac. Although he was standing outside of the Cadillac, he was leaning down over the front seat. According to Officer Larrabee, it looked like he was lying down on the seat and was just rising up. As the officers approached, the man stood up, looked at the police car and tried to close the driver's side door as he walked away, but left the door somewhat ajar. With their weapons drawn, the officers (wearing plain clothes) identified themselves as the police and commanded the man to stop, show his hands and get down on the ground. He stopped 10 to 12 feet from the Cadillac, but did not lie on the wet ground. When he did not fully comply, two of the officers took physical control of him and brought him to the ground without resistance. They handcuffed him and then frisked for weapons, but found none. While holstering their weapons, they identified the man as Ray Bradley and asked him what happened and why he was running.

Once handcuffed, Bradley told the officers that a Crips gang member had shot at him, describing the person as wearing a blue beanie hat, a dark coat and light-colored pants. Upon hearing this description, the officers relayed it over the police radio. A police officer at a different location, however, radioed information obtained from a witness who said that the person who fired the shots near the 200 block of Pine Street was a black male wearing a tan-colored shirt and dark pants. Despite the fact that this description fit Bradley, Officer Giroux walked up the alley to locate an individual with a gun. When he turned the corner onto the sidewalk on Pine Street, he found six .380-caliber shell casings. After placing the casings in bags, Officer Giroux returned to the parking lot and found Officers Leist and Larrabee questioning Bradley. Bradley told Leist that he had left a nearby bar when 20 kids shot at him. He ran around the corner in fear for his life, he said. According to Bradley, when he arrived at his car he remembered that he forgot his jacket at the bar and turned back to get it when the police arrived.

At some point before Officer Giroux returned to the

parking lot, Officer Leist had conducted a search of Bradley's car. (The details of Officer Leist's search are uncertain because he was unavailable for trial.) When Officer Giroux returned and told the others about the shell casings, he proceeded to search Bradley's vehicle also. He looked under the seat, in the crack of the seat, above the visor, in the back of the vehicle and then went around the car to look at the passenger's side. As Giroux searched, Officer Larrabee followed him, searching in more detail and continuing the search after Giroux left to check on damage to surrounding buildings. Meanwhile, Officer Leist remained with Bradley the entire time. Between some loose carpeting and the firewall near the dashboard and the front passenger seat, Officer Larrabee found a semiautomatic handgun. About thirty minutes had passed between the time the officers first contacted Bradley and actually finding the gun. Officer Larrabee then advised Bradley of his rights while Bradley sat detained in a police van. In a more intensive search of Bradley himself, the officers found a quantity of illegal narcotics.

At the suppression hearing, Officer Larrabee testified that although he was not certain of the exact timing, the information they received over the radio giving the description matching Bradley came shortly after making contact with him. Upon cross-examination, he also acknowledged that once they had Bradley on the ground and handcuffed, there was no threat to officer safety:

> Q. At the point that Mr. Bradley is down on the ground and is handcuffed and you have determined that he is not armed with any kind of a weapon, you're satisfied you've got the situation relatively under control at that point; [sic] don't you?
>
> A. Yes, from my little area of responsibility there, yes, I felt that it was under control.
>
> . . . .
>
> Q. [T]here was no danger at that point of Mr. Bradley getting to that vehicle in some kind of uncontrolled fashion and reaching that gun?

A. That's a fair statement.

Q. You weren't concerned about officer safety then in terms of if there was a gun or a knife or some dangerous weapon in that vehicle, at that point you were no longer concerned that someone could get to that vehicle and get it and use it against you?

A. That's a fair statement, yes.

3 Report of Proceedings (RP) at 71-73.[1]

Officer Giroux testified that Bradley was not under arrest at the time they searched the car. In his testimony, Officer Larrabee concurred and stated that they did not have probable cause to arrest Bradley at the time of the search. At the suppression hearing, Larrabee said they obtained Bradley's consent to search his vehicle. According to Larrabee, if Bradley had not consented to the search, they would have let him leave with his car and the gun later found inside. Following the hearing, the trial court concluded that the search was not done with consent nor incident to arrest but rather was a protective search: "[T]he search was a valid protective search for weapons on well-grounded, reasonably articulable suspicions that a gun was in the defendant's car." Clerk's Papers at 37. Thereafter, the trial court found Bradley guilty of unlawful possession of a firearm in the second degree and unlawful possession of cocaine based on stipulated facts. Bradley appeals.[2]

---

[1] 1 RP (Mar. 11, 1999).
2 RP (Mar. 12, 1999).
3 RP (Mar. 15, 1999).
4 RP (Mar. 16, 1999).

[2] Because Bradley does not challenge the trial court's findings after the suppression hearing, they are binding on appeal. *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).

## DISCUSSION

## I

### Search Incident to Investigatory Stop

 Bradley argues that the police officers' search of his vehicle was improper under the Washington Constitution. The State contends that the search of his vehicle was valid as a protective search for weapons and as part of the officers' reasonable investigation of suspected criminal activity. Article I, section 7 of the Washington Constitution declares: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." This section of our constitution provides greater protection to an individual's right of privacy than the Fourth Amendment to the United States Constitution. *State v. Parker*, 139 Wn.2d 486, 493, 987 P.2d 73 (1999). Washington courts have long held that freedom from governmental intrusion into one's "private affairs" includes automobiles and their contents. *Parker*, 139 Wn.2d at 494. Accordingly, our state has greater privacy rights in automobiles than those guaranteed by the Fourth Amendment. *Parker*, 139 Wn.2d at 495. Warrantless searches, even of automobiles, are unreasonable per se. *Parker*, 139 Wn.2d at 496. Because we consider this a strict rule, our courts limit and narrowly construe exceptions to the warrant requirement. *Parker*, 139 Wn.2d at 496. When challenged, the State bears the heavy burden to prove that a warrantless search falls within an exception. *Parker*, 139 Wn.2d at 496.

Bradley challenges the warrantless search of his vehicle as beyond the scope of a *Terry*[3] stop (an investigatory stop). Under the Washington Constitution, a valid *Terry* stop may include a search of the suspect's vehicle when the search is necessary to assure officer safety. *State v. Kennedy*, 107 Wn.2d 1, 12, 726 P.2d 445 (1986); *State v. Larson*, 88 Wn. App. 849, 853, 946 P.2d 1212 (1997); Charles W. Johnson,

---

[3] *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

*Survey of Washington Search and Seizure Law: 1998 Update*, 22 SEATTLE U. L. REV. 337, 397 (1998). A search for weapons may extend only to areas within the investigatee's immediate control. *Kennedy*, 107 Wn.2d at 12. The scope of the search may expand to areas of the vehicle's interior where another person remains seated inside the car or where the investigatee has made a furtive gesture as if to hide a weapon. *Larson*, 88 Wn. App. at 855-57.

In *Larson*, when a police officer maneuvered his police car directly behind Larson's speeding truck, the officer observed Larson lean forward and make movements toward the floorboard of his truck. *Larson*, 88 Wn. App. at 851. The officer directed Larson out of the truck, patted him down and then stuck his head in the cab of the truck through the open door to inspect the area around the driver's seat. *Larson*, 88 Wn. App. at 851. Based on his observation of Larson's furtive movement and anticipation that Larson would have to return to the vehicle to obtain his vehicle registration, this Court held that the officer's concern for his safety was objectively reasonable and the search for weapons was proper in scope. *Larson*, 88 Wn. App. at 857.

In *Kennedy*, when an officer stopped a vehicle after observing and receiving tips about drug-related activities, the officer saw the driver lean forward in a way that looked like he was secreting something in the front seat of the car. *Kennedy*, 107 Wn.2d at 11. The Washington Supreme Court held that the officer could lawfully search for weapons in areas within the immediate control of both the driver and his companion. *Kennedy*, 107 Wn.2d at 12. In another traffic stop case, an officer observed a passenger lean forward as if to place something under the seat. *State v. Watkins*, 76 Wn. App. 726, 728, 887 P.2d 492 (1995). This Court held that the police had the authority to ask the passenger to exit the car and to search for weapons in the area within his immediate control based on his furtive movements alone. *Watkins*, 76 Wn. App. at 730.

■ Minutes after hearing gunshots, the police officers here observed Bradley run down an alley, lean into a vehicle

and then walk away. When Bradley did not respond cooperatively to the officers' commands to stop, the officers forced him to the ground and then handcuffed and frisked him. Officer Larrabee detained Bradley inside a police van while Officer Giroux investigated and secured the surrounding area. At the same time, Officer Leist searched Bradley's car. Upon cross-examination at trial, Officer Larrabee acknowledged that at that point there was no longer any danger of Bradley obtaining a weapon from the vehicle. Unlike the traffic stop in *Larson*, the facts here did not require Bradley to later reenter the vehicle to obtain his vehicle registration. Despite similar furtive movements, *Kennedy* and *Watkins* are also distinguishable because the defendants in those cases had companions who remained in the vehicle and could have accessed a weapon. *Kennedy*, 107 Wn.2d at 11; *Watkins*, 76 Wn. App. at 730. Because the officers' safety was no longer in danger, we conclude that a search of Bradley's vehicle was beyond the scope of an investigatory stop.

## II

### Search Incident to Arrest

■■ The State insists that the police made a lawful search incident to arrest even though the trial court ruled it out. An appellate court may affirm a trial court's decision on any theory supported by the record and the law. *State v. Guttierrez*, 92 Wn. App. 343, 347, 961 P.2d 974 (1998). In making an arrest, officers may search the passenger compartment of a vehicle for weapons or destructible evidence if the vehicle was in the immediate control of the suspect at the time of—or just prior to—an arrest. *State v. Stroud*, 106 Wn.2d 144, 152, 720 P.2d 436 (1986) (defendants were beside vehicle); *State v. Lopez*, 70 Wn. App. 259, 270, 856 P.2d 390 (1993) (defendant was 50 to 60 feet from vehicle). *But cf. State v. Porter*, 102 Wn. App. 327, 334, 6 P.3d 1245 (2000) (defendant was not in immediate control of vehicle after walking 300 feet away). *Stroud* explicitly allows a

search of an automobile incident to arrest after the suspect is handcuffed and in the patrol car. *Stroud*, 106 Wn.2d at 152; *State v. Boursaw*, 94 Wn. App. 629, 634, 976 P.2d 130 (1999). There are limitations on such warrantless searches: (1) officers may not open a locked container or locked glove compartment; (2) the search must be contemporaneous with arrest; and (3) the suspect must remain at the scene. *Stroud*, 106 Wn.2d at 152; *Boursaw*, 94 Wn. App. at 632-33.

Nonetheless, a search incident to arrest is valid if there is probable cause to arrest a suspect for the relevant offense at the time of the search, even if the officer does not subjectively consider the suspect formally under arrest but merely detained. *State v. Harrell*, 83 Wn. App. 393, 401, 923 P.2d 698 (1996).[4] Probable cause exists where the facts and circumstances known to the arresting officer are sufficiently trustworthy to cause a reasonable person to believe that an offense has been committed. *Harrell*, 83 Wn. App. at 399. Because a determination of probable cause is an objective inquiry, we may consider the *cumulative* information possessed by all officers in a joint investigation. *Harrell*, 83 Wn. App. at 400.

In *Harrell*, three witnesses identified Harrell as within the immediate vicinity of an explosion. *Harrell*, 83 Wn. App. at 400. Two witnesses saw him light something while one saw him throw something moments before the explosion. *Harrell*, 83 Wn. App. at 400. All three saw him hurry away immediately afterwards. *Harrell*, 83 Wn. App. at 400. A fire investigator had taken these witness statements and called

---

[4] In a footnote, Bradley asks how *Harrell* can be reconciled with language in *Parker*, 139 Wn.2d at 496-97, that requires a lawful custodial arrest before a search incident to arrest. *See also State v. Armenta*, 134 Wn.2d 1, 16, 948 P.2d 1280 (1997). *Parker* and *Armenta* are distinguishable because in neither case did the police have probable cause to arrest the defendants. *See Parker*, 139 Wn.2d at 490-92; *Armenta*, 134 Wn.2d at 14. Although the officers here did not subjectively consider Bradley formally under arrest, they handcuffed him and upon gathering more information had probable cause to arrest before searching his car. *Cf. Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980) (because police had probable cause to arrest, it was not particularly important that the search preceded the arrest); *State v. Smith*, 88 Wn.2d 127, 138, 142-43, 559 P.2d 970 (1977) (probable cause to arrest and exigent circumstances justified search as incident to arrest despite the lack of a formal arrest) (citing *State v. Brooks*, 57 Wn.2d 422, 425-27, 357 P.2d 735 (1960)).

a nearby police officer who came upon Harrell serendipitously while investigating a domestic violence call involving a codefendant. *Harrell*, 83 Wn. App. at 396-97. The officer detained Harrell and, before placing him in his patrol car, frisked him for weapons and found a homemade bomb. *Harrell*, 83 Wn. App. at 397. This Court held that the search constituted a valid search incident to arrest because even before the search there existed probable cause to believe that Harrell had committed the offense of possession of an incendiary device. *Harrell*, 83 Wn. App. at 400-01.

Here, the officers heard several gunshots coming from the area where they found Bradley. When they drove down the alley, they saw him running toward them and then turn into a parking lot. Upon arriving in the parking lot, the officers witnessed Bradley make furtive movements in his car and then turn and walk away. He told them that a Crips gang member wearing a blue beanie hat, dark coat and light-colored pants had shot at him. Then he made the suspicious statement that he was going back to get his coat. The officers received witness information over their radio that described the suspect as a black male wearing a tan-colored shirt and dark pants near the 200 block of Pine Street. This description fit Bradley perfectly. Moreover, Officer Giroux found six shell casings for a .380 firearm at the north end of the alley where they first saw Bradley running. Based on these cumulative facts, we conclude that the officers had probable cause to believe that Bradley unlawfully fired a gun. We hold that the search of the vehicle was a valid search incident to arrest and that the trial court properly denied Bradley's motion to suppress the gun found in the car.

## CONCLUSION

To summarize, the search of Bradley's car was not a valid search incident to an investigatory stop because officer safety was not a concern at the time. Rather, the search was valid as a search incident to arrest because the officers had

probable cause to arrest him based on their collective knowledge.

We affirm.

BECKER, A.C.J., and APPELWICK, J., concur.

After modification, further reconsideration denied July 17, 2001.